UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| MORGAN WEST, Personal Representative )<br>of the Estate of Ryan West, Deceased, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>VALERO RENEWABLE FUELS )<br>COMPANY, LLC, )<br>)<br>Defendant. ) | Cause No. 1:19-CV-463-HAB |

**OPINION AND ORDER**

The parties agree that the death of Ryan West ("West") was a tragic accident. The parties disagree, however, on whom the blame for that accident should fall. That issue is now before the Court on summary judgment (ECF No. 57), filed by Defendant Valero Renewable Fuels Company, LLC. ("Valero"). As the Court views the case, the liability issue rises and falls on one question: was Valero aware, or should it have been aware, that an individual was working on Conveyor #6621 at the time of West's death? The summary judgment motion having been fully briefed, the Court now sets out to answer that question.[1]

**I.      Evidentiary Objections**

Before addressing the merits, the Court must first resolve Valero's Motion to Strike (ECF No. 67). Valero seeks to strike two categories of evidence relied on by Plaintiff in resisting summary judgment: (1) Plaintiff's expert reports; and (2) the IOSHA report prepared after West's accident. The Court shares some of Valero's concerns over the expert reports, but reference to

---

[1] The Court heard oral argument on the pending motions on September 14, 2021. Counsel are commended for their preparation and oral advocacy.

those reports is unnecessary to rule on Defendant's request for summary judgment. The objection to the IOSHA report, on the other hand, must be dealt with.

Valero claims that the IOSHA report is "inadmissible hearsay (and at times, double hearsay) to which no hearsay exception applies." (ECF No. 67 at 6). The Court does not agree. Of course, hearsay is not admissible unless an exception applies. Fed. R. Evid. 802. One such exception allows a party to introduce:

> A record or statement of a public office if:
>
> > (A) it sets out:
> >
> > > (i) the office's activities;
> > >
> > > (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
> > >
> > > (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
> >
> > (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Fed. R. Evid. 803(8). Courts have, generally, found that Rule 803(8) allows the admission of OSHA reports. *See*, *e.g.*, *Masello v. Stanley Works, Inc.*, 825 F. Supp. 2d 308, 315–17 (D. N. H. 2011); *Masemer v. Delmarva Power & Light Co.*, 723 F. Supp. 1019, 1020–21 (D. Del. 1989). The IOSHA report, then, can be considered by the Court at the summary judgment stage.

That said, Valero believes that there is hearsay within the IOSHA report — statements of Valero's employees. (ECF No. 61-4). The problem with Valero's argument is that the statements of its employees are not hearsay. Fed. R. Evid. 801(d)(2)(D) provides that a statement offered against an opposing party that "was made by the party's agent or employee on a matter within the scope of that relationship while it existed" is not hearsay. "The only requirement is that the subject

2

matter of the admission match the subject matter of the employee's job description." *Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 762 (7th Cir. 2003). The Court finds that the statements by Valero employees in the IOSHA report fall within the scope of their employment; they are not hearsay. The Court can, and will, consider the IOSHA report in ruling on summary judgment.

**II.     Factual Background**

West's fatal accident occurred on June 19, 2019, at an ethanol plant owned by Valero. The plant was in Bluffton, Indiana. At the time of the accident, the plant was shut down for maintenance, with no production or manufacturing occurring.

West was employed by Diversified Industrial Services, LLC ("DIS") as a lead in the company's industrial maintenance division. By all accounts, West was a model worker and one of DIS' most competent employees on a job site. Consistent with this reputation, West was DIS' "safety lead" at the plant, meaning that he was responsible for other DIS employees on the jobsite.

DIS had performed maintenance on other Valero plants, and this plant specifically, before June 2019. This time, there was no written contract setting forth the scope of work. Instead, Valero employees communicated with West to establish a scope of work. According to Valero, DIS' work was to perform maintenance on the conveyors in the Energy Center building and fix any air boxes, failed bearing, or sprockets as needed.

On the morning of the accident, West and Valero employee Lance Shepherd ("Shepherd") met to discuss the day's work. The result of that meeting was a Valero "Safe Work Permit." For the scope of work, the Safe Work Permit provided, in relevant part:

> **Valero renewables**
>
> **Safe Work Permit**
> (To be completed by the Owning Department)
>
> Permit # 004283
> PERMIT TIMING
> Permit Issued:
> Issued: Date: 6/19/19  Time: 715
> Valid Until: Date: 6/19/19  Time: 1900
> Permit Extension:
> Issued: Date: _____ Time: _____
> Valid Until: Date: _____ Time: _____
> Authorize Extension
>
> **A. WORK SCOPE** Check box(es) to indicate type of work required to complete task.
> ☑ Joint Job Site visit conducted in field - Owner _LDS_ Safety Lead _[initial]_
> ☑ Level I Hot Work  ☑ Level II Hot Work  ☑ Crane/Manlift
> ☐ Confined Space Entry   Work Duration: 12 hrs
> Area: Energy Center    Work Order #: _____
> Equipment Number and Description: Dryer Drag Screws
> Work To Be Performed: Manlift - cut off old bolts with grinder - battery hand tools & steel tools
> Safety Lead: _____
> Owning Department: _____
>
> Company: Diversified   Emergency Contact: Aaron Baldwin   Phone: 937-402-7725

(ECF No. 58-1 at 1).

As part of that meeting, Shepherd and West discussed Valero's Lock Out Tag Out ("LOTO") procedures. In layman's terms, the LOTO procedures ensured that certain equipment was disconnected from the plant's electrical power and was non-operational. West confirmed on the Safe Work Permit that the LOTO plan had been completed and that his work fit within that plan; in other words, West confirmed that the equipment he would be working on was non-operational.[2]

According to Shepherd, West stated that he would be working "behind dryer A" on the day of the accident. This was inside the Energy Center. Consistent with the LOTO policy, only equipment inside the Energy Center was disconnected from power.

At this point, it helps to understand the lay out of the Energy Center. The Energy Center is a large, two-story building. The first story looks like this:

---

[2] According to Plaintiff, Shepherd testified he "failed to perform the physical walk through to confirm the LOTO of specific equipment to be worked on, failed to confirm the type of work to be performed, and failed to confirm the physical location" of the work. (ECF No. 60 at 2). Plaintiff's citation for this "fact" is not Shepherd's testimony, but one of Plaintiff's expert reports. In any event, the Safe Work Permit, signed by Shepherd *and West*, shows that these activities were performed.

4



(ECF No. 57 at 11). Dryer A is in the southeast corner of the first floor of the building.

It is at this point when the parties' versions of events diverge. Valero employee Dennis Roush ("Roush") testified at his deposition that DIS' work was confined to "the four walls of the energy center. Nothing outside of it was being done." (ECF No. 57-3 at 4). Even so, in a written statement to IOSHA, Roush advised that five gearboxes on "upper conveyors" were "questionable and were going to be worked on." (ECF No. 61-6 at 2). The IOSHA report shows that these "upper conveyors" included Conveyor #6621, the conveyor responsible for the fatal accident. (ECF No. 61-4 at 2). Conveyor #6621 is an auger conveyor located outside the Energy Center in the Wet Cake Pad area. As shown in the diagram above, the "Wet Pad" is located on the north side of the Energy Center.

Kevin Funk ("Funk"), a DIS employee working with West, has testified that work on Conveyor #6621 began the day before the accident. (ECF No. 57-7 at 2). The two men worked on

the conveyor until around 6:00 p.m. on June 18. During that time, West determined that hanger bearings on the conveyor needed to be replaced. Security camera video from June 18 confirms that an individual was working around the conveyor on that day.

When Funk arrived the next morning, West was at Conveyor #6621 but had not received the required hanger bearings. Funk left to attend to work inside the Energy Center. Funk later returned to Conveyor #6621, at which time West had the bearings and was working to install them.

The source of the bearings is another point of dispute. The parties agree that West, like other contractors at the plant, had two sources of parts: they could request the parts directly from Roush or they could obtain the parts themselves from the plant maintenance area. Funk does not know where West got the replacement bearings for Conveyor #6621. Roush has submitted an affidavit denying that he was the source. (ECF No. 57-2 at 3). Yet the IOSHA report states that Roush told the IOSHA investigator that "parts for the repairs were requested and supplied by Valero maintenance as is normal procedure when contractors are performing work on Valero equipment." (ECF No. 61-4 at 2).

While West was working on Conveyor #6621, someone activated the plant's distributed control system. Because Conveyor #6621 was not part of the LOTO plan for that day, it started when the distributed control system was activated. The parties agree that Conveyor #6621 was not intentionally started.

West was inside the conveyor when it started and was immediately trapped. Funk, who was next to the conveyor when it started, looked for an emergency stop button but could not find one. Power to Conveyor #6621 was eventually shut off from inside the Energy Center by a Valero employee. This was too late for West, who suffered multiple amputations resulting in his death.

**III.     Legal Analysis**

**A.      *Summary Judgment Standard***

Although state law provides the substantive law in a diversity action, the summary judgment procedure is governed by federal law. *Maroules v. Jumbo, Inc.*, 452 N.E.3d 639, 645 (7th Cir. 2006). More than twenty-five years ago, the Indiana Supreme Court observed, rightly, that the Indiana state summary judgment standard and the federal summary judgment standard are very different.

> Under Indiana's standard, the party seeking summary judgment must demonstrate the absence of any genuine issue of fact as to a determinative issue, and only then is the non-movant required to come forward with contrary evidence.
> 
> * * *
>
> In this respect, Indiana's summary judgment procedure abruptly diverges from federal summary judgment practice. Under the federal rule, the party seeking summary judgment is not required to negate an opponent's claim. The movant need only inform the court of the basis of the motion and identify relevant portions of the record which it believes demonstrate the absence of a genuine issue of material fact. The burden then rests upon the non-moving party to make a showing sufficient to establish the existence of each challenged element upon which the non-movant has the burden of proof. Indiana does not adhere to *Celotex* and the federal methodology.

*Jarboe v. Landmark Comm. Newspapers of Ind., Inc.*, 644 N.E.2d 118, 123 (Ind. 1994) (citations omitted). While Indiana does not follow the procedure set forth in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), federal courts, including this one, do. Thus, in this case the burden is on Plaintiff to establish the existence of the elements he would need to prove at trial. Failure to do so dooms his claim no matter what an Indiana court may do on the same facts, since "[f]ederal courts may grant summary judgment under Rule 56 . . . even if the state would require the judge to submit an identical case to the jury." *Carson v. ALL Erection & Crane Rental Corp.*, 811 F.3d 993, 998 (7th Cir. 2016).

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in its favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists cannot create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

Unlike in Indiana, *see, e.g.*, *Hughley v. State*, 15 N.E.3d 1000, 1004 (Ind. 2014) ("Indiana consciously errs on the side of letting marginal cases proceed to trial on the merits"), summary judgment is not a disfavored remedy in federal court. "Summary judgment procedure is properly

regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327. It can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact. *United Food and Com. Workers Union Local No. 88 v. Middendorf Meat Co.*, 794 F. Supp. 328, 330 (E.D. Mo. 1992). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**B.** *Genuine Issues of Material Fact Exist*

Plaintiff's sole cause of action is one for wrongful death. In Indiana, the elements of a wrongful death claim are a duty owed by the defendant to the decedent, breach of that duty, and injury proximately caused by the breach. *Tom v. Voida*, 654 N.E.2d 776, 787 (Ind. Ct. App. 1995).

The parties agree that a duty existed. Generally, the owner of property is under no duty to provide an independent contractor with a safe place to work, but there is a duty to keep the property in a reasonably safe condition. *Ozinga Transp. Systems, Inc. v. Michigan Ash Sales, Inc.*, 676 N.E.2d 379, 384 (Ind. Ct. App. 1997). This duty extends to employees of independent contractors, as well. *Bethlehem Steel Corp. v. Lohman*, 661 N.E.2d 554, 556 (Ind. Ct. App. 1995). Also, landowners generally owe a duty to warn independent contractors of latent or concealed perils on the premises. *Ozinga*, 676 N.E.2d at 384. A landowner is also liable for reasonably foreseeable injuries to a contractor's employee caused by hazardous instrumentalities maintained by the landowner on the landowner's premises. *Id*. In short, Valero had to exercise reasonable care for West's protection. *Rogers v. Martin*, 63 N.E.3d 316, 322 (Ind. 2016).

9

The parties vehemently disagree as to whether Valero breached that duty. Valero asserts that there is "a total absence" of evidence supporting breach, claiming:

> In fact, the undisputed facts show that Valero followed its internal LOTO Policy; Valero *did not* tell Ryan West to work outside the Energy Center; Valero did not provide Ryan West with parts to perform maintenance on Conveyor #6621; and Valero was not cited by IOSHA in connection with Ryan West's death.

(ECF No. 57 at 9–10) (original emphasis). The Court agrees with Valero, in part. The record is undisputed that Valero followed its LOTO policy, and Valero was not cited by IOSHA. That said, the Court finds enough evidence on the other points to require a trial.

Plaintiff points to two pieces of evidence in support of his claim that West worked on Conveyor #6621 at Valero's request. The first is an excerpt from the IOSHA report that states, in part:

> Valero management stated that these augers were not included in the scope of work. However, [Roush] stated that the upper level auger conveyors were going to be worked on due to being questionable and that parts for the repairs were requested and supplied by Valero maintenance as is normal procedure when contractors are performing work on Valero equipment. While the victim was working on this conveyor, the control center was shut down for other planned maintenance. When this power was turned on, a run command was sent to the upper level conveyors. The victim became trapped in the auger conveyor and was crushed and sustained multiple amputations and passed away at the scene of the accident.

(ECF No. 61-4 at 1–2). The second is part of Roush's written IOSHA statement, in which he writes, "discussed overview of work that day, discussed 5 gearboxes on upper conveyors that were questionable and were going to be worked on." (ECF No. 61-6 at 2).

Valero's response notes that Roush has denied, under oath, discussing any work outside the energy center. In his deposition, Roush testified that the upper-level conveyors and the questionable gearboxes were all located on the "second deck mezzanine" of the energy center. (ECF No. 65-3 at 4). Roush expressly denied knowing that West or anyone else would be working on Conveyor #6621. (*Id.*). According to Valero, the suggestion that the IOSHA reports are

referring to Conveyor #6621 is little more than Plaintiff "trying to contort the phrase 'upper level conveyors.'" (ECF No. 65 at 11).

"When a subsequent sworn statement contradicts a prior unsworn admission, a genuine issue of fact exists." *Davenport v. Potter*, 2008 WL 4126603, at *2 (N.D. Ill. Aug. 15, 2008) (collecting cases); *see also Jean v. Dugan*, 814 F. Supp. 1401, 1404 (N.D. Ind. 1993). This is precisely the situation before the Court. A reasonable inference to be drawn from the IOSHA report is that Roush and West discussed Conveyor #6621. The report's reference to West working on "this conveyor" is a clear call back to the "upper level auger conveyors" discussed in the previous sentence. True, Roush denies that he ever discussed Conveyor #6621 with West. But "[d]etermining which of two such contradictory statements is true is the function of the factfinder after a trial, not a judge on a motion for summary judgment." *Davenport*, 2008 WL 4126603, at *3. Whether Valero asked West to work on Conveyor #6621 presents a genuine issue of material fact.

Much the same analysis applies to how West got the parts to repair Conveyor #6621. The IOSHA report leads to the reasonable inference that the parts for the repairs to Conveyor #6621 were requested from, and provided by, Valero. The report references conveyor repairs and then states that parts "for the repairs" were provided by Valero. Again, Roush expressly denies that he was the source of the parts, but that does little more than create a genuine issue of material fact. *Davenport*, 2008 WL 4126603, at *2.

Having found genuine issues of material fact on these points, the resolution of Valero's motion for summary judgment is straightforward. If Roush asked West to work on Conveyor #6621 on the day of the accident, and if Roush provided the parts for that work, a jury could easily find that Valero should have taken additional precautions before starting the distributed control

11

system. Having failed to do so, the jury could find that Valero violated its duty of reasonable care. The Court cannot enter summary judgment on these facts.

Valero's legal authorities do not change the Court's analysis. Valero mainly relies on *Alvarez v. CSX Corp.*, 2013 WL 1870578 (N.D. Ind. May 2, 2013). There, the decedent, an electrician, was called to a railroad terminal after a lightning strike damaged a conductor wire. The decedent worked without protective equipment and without requesting that power to the wire be turned off. At some point the decedent touched the two sides of the broken line with his bare hands and was electrocuted. Magistrate Judge Paul Cherry concluded that, because there was no evidence that the landowner had any more knowledge of potential danger than the decedent, no duty was breached. *Id.* at 8–11. Magistrate Judge Cherry wrote: "[t]his is not a situation where an electrician called to fix an electrical problem was injured by a condition not created or addressed by the contractor (like a preexisting hole in the roof) or an activity conducted by somebody other than the plaintiff or the plaintiff's employer (such as demolition work by another contractor), situations where it is appropriate to hold the possessor liable for injury to an independent contractor." *Id.* at 11 (quotations omitted).

Unlike *Alvarez*, this case does present a situation in which West was injured by an activity conducted by someone else. Conveyor #6621 did not imperil West until Valero turned on the distributed control system. Neither West nor DIS was at the plant to perform work or maintenance on the distributed control system. There is no evidence that West knew that Valero would activate the distributed control system, or that its activation would turn on Conveyor #6621. Neither the scope of the work, nor the comparative knowledge, in this case is like that in *Alvarez*.

The Court concedes that Plaintiff's evidence is not overwhelming. As Valero notes, Plaintiff's case relies largely on statements recorded by a third-party that have been expressly

disavowed under oath. But the Court's role at this point is not to weigh the strength of the parties' cases. Instead, it is solely to determine whether factual disputes must be resolved by a fact finder. The Court believes that those disputes exist, and Valero's motion for summary judgment must be denied.

**IV.  Conclusion**

For these reasons, Valero's motion for summary judgment (ECF No. 57) and motion to strike (ECF No. 67) are DENIED.

SO ORDERED on November 3, 2021.

                                           s/ *Holly A. Brady*
                                           JUDGE HOLLY A. BRADY
                                           UNITED STATES DISTRICT COURT